## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
                                )

**LISA V. MULRAIN,**                )
                                )

                **Plaintiff,**         )
                                )

                   **v.**            )        **Civil Action No. 10-1601 (ESH)**
                                )

**SHAUN DONOVAN,**             )
**Secretary of Housing and Urban Development**   )
                                )

                 **Defendant.**    )
_____)

## MEMORANDUM OPINION

      Plaintiff Lisa Mulrain has sued Shaun Donovan, the Secretary of Housing and Urban

Development ("HUD"), under Title VII of the Civil Rights Act of 1964.  42 U.S.C. § 2000e *et*

*seq.*  She alleges that she was not selected for the position of Deputy Assistant General Counsel

in the HUD Office of General Counsel's Finance Division because she is African-American.

Before the Court is defendant's Motion for Summary Judgment (Mar. 30, 2012 [ECF No. 25]

("Def.'s Mot.")).  For the reasons stated below, defendant's motion for summary judgment will

be granted.

## BACKGROUND

### I.      FACTS

      The Government National Mortgage Association ("GNMA") is a wholly-owned

government corporation that guarantees mortgage-backed securities issued in the secondary

mortgage market.  (Defendant's Statement of Material Facts Not in Genuine Dispute, Mar. 30,

2012 [ECF No. 25] ("Def.'s Statement") ¶ 1; Plaintiff's Opposition to Defendant's Motion for

Summary Judgment, July 11, 2012 [ECF No. 29-1] ("Pl.'s Opp'n") at 10.)  GNMA receives legal

advice and representation from the Finance Division within HUD's Office of General Counsel

("OGC").  (Def.'s Statement ¶ 6; Pl.'s Opp'n at 12.)  The Finance Division is headed by

Assistant General Counsel Katherine Davies.  (Def.'s Statement ¶ 7; Pl.'s Opp'n at 3.)  Ms.

Mulrain has served as an Attorney-Advisor in the Finance Division since August 2000.  (Pl.'s

Opp'n at 1; Mulrain Decl. ¶ 1.)

      The Finance Division is overseen by the Office of Finance and Administrative Law.

(Def.'s Statement ¶ 14; Plaintiff's Statement of Genuine Issues, June 29, 2012 [ECF No. 28-57]

("Pl.'s Statement") ¶ 14.)  Beginning in 2005, the Office of Finance and Administrative Law was

run by Associate General Counsel John Opitz.  (Def.'s Statement ¶ 14; Pl.'s Opp'n at 3.)  Mr.

Opitz believed that there was a need for a Deputy Assistant General Counsel ("DAGC") position

within the Finance Division.  (Def.'s Statement ¶ 16.)  In May 2006, a formal Position

Description was created for the new DAGC position, and it was graded at the GS-15 level.

(Def.'s Ex. 7; Pl.'s Statement ¶ 21.)  Mr. Opitz received authorization to fill that position in

November 2007.  (Def.'s Ex. 6; Pl.'s Statement ¶ 20.)  A Vacancy Announcement for the DAGC

position was posted on December 13, 2007, and remained open until January 14, 2008.  (Def.'s

Ex. 8; Pl.'s Opp'n at 2; Pl.'s Statement ¶ 23.)

      Ms. Mulrain applied for the DAGC position, along with nineteen other applicants.  (Pl.'s

Ex. 32, Gerber Report at 3.)  The twenty applications were reviewed and seven "best qualified

candidates" were identified.  (Def.'s Ex. 10; Pl.'s Ex. 32 at 3.)  Of those seven, two—including

Ms. Mulrain—were African-American, one was Asian, and four were Caucasian.  (Def.'s Ex. 11;

Pl.'s Statement ¶ 28.)  Mr. Opitz and Ms. Davies interviewed the seven "best qualified

candidates" in February 2008, including Ms. Mulrain, who was interviewed on February 15, 2008.  (Def.'s Statement ¶ 34; Pl.'s Statement ¶ 34.)

Roughly two weeks earlier, on January 31, 2008, Maura Malone, a HUD attorney serving as the DAGC in the Administrative Proceedings Division, informed senior OGC officials that she had accepted a job with the Department of the Army.  (Def.'s Statement ¶ 39; Def.'s Ex. 18; Pl.'s Opp'n at 4.)  Ms. Malone's supervisor, John Herold, emailed other top OGC management officials to inform them of Ms. Malone's impending departure, calling it a "big loss for HUD." (Def.'s Statement ¶ 40; Def.'s Ex. 18; Pl.'s Statement ¶ 40.)  Linda Cruciani, the career Deputy General Counsel at HUD, encouraged Ms. Malone to reconsider her departure and to explore other positions within HUD.  (Def.'s Statement ¶ 41; Def.'s Ex. 19; Pl.'s Opp'n at 5.)  As a result of that conversation, Ms. Malone agreed to consider other opportunities.  (Def.'s Statement ¶ 41.)

At some point in February 2008, Ms. Malone spoke with Mr. Opitz about an available position in the Office of Procurement and learned about the Finance Division DAGC opening. (Def.'s Statement ¶¶ 46-49; Pl.'s Statement ¶¶ 46-49.)  She later met with Ms. Davies to discuss the DAGC position.  (Def.'s Statement ¶ 51.)  After that meeting, Mr. Opitz informed Ms. Cruciani that if she "wanted to reassign" Ms. Malone to the Finance Division, he and Ms. Davies would "be happy with that."  (Def.'s Statement ¶ 55; Pl.'s Opp'n at 8, quoting Pl.'s Ex. 52, Opitz EEOC Dep. 133:12-16.)

On March 6, 2008, the Vacancy Announcement for the Finance Division DAGC position was cancelled, and on March 17, 2008, OGC announced that Ms. Malone would be filling the position.  (Def.'s Exs. 23, 24; Def.'s Statement ¶¶ 58-59; Pl.'s Statement, ¶¶ 58-59.)

Ms. Mulrain then filed a formal EEO complaint alleging race discrimination based on the cancellation of the Vacancy Announcement and the selection of Ms. Malone to fill the DAGC position.  (First Amended Complaint, Sept. 12, 2011 [ECF No. 20] ¶ 31.)  Thereafter, on September 21, 2010, Ms. Mulrain filed the instant action.  (Complaint, Sept. 21, 2010 [ECF No. 1].)

## ANALYSIS

### I.      STANDARD OF REVIEW

#### A.      Summary Judgment

A motion for summary judgment is appropriate when the pleadings, the discovery and disclosure materials on file, and any affidavits show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).  There is a genuine dispute as to a material fact if a "reasonable jury could return a verdict for the nonmoving party."  *Galvin v. Eli Lilly & Co.*, 488 F.3d 1026, 1031 (D.C. Cir. 2007) (quoting *Anderson*, 477 U.S. at 248).  A moving party is thus entitled to summary judgment against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Waterhouse v. Dist. of Columbia*, 298 F.3d 989, 992 (D.C. Cir. 2002) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

When considering a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Anderson*, 477 U.S. at 255.  However, the non-moving party "may not rely merely on allegations or denials in its own pleading," *see* Fed. R. Civ. P. 56(c), but instead must offer specific facts showing that genuine

issues exist for trial.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586

(1986).

　　While summary judgment "must be approached with special caution in discrimination

cases, a plaintiff is not relieved of her obligation to support her allegations by affidavits or other

competent evidence showing that there is a genuine issue for trial."  *Bolden v. Winter*, 602 F.

Supp. 2d 130, 136 (D.D.C. 2009) (internal quotation marks omitted).

　　**B.**　　**Title VII**

　　Under Title VII, it is unlawful for an employer to "fail or refuse to hire or to discharge

any individual, or otherwise to discriminate against any individual with respect to his

compensation, terms, condition, or privileges of employment, because of such individual's race,

color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).  There are two essential

elements of a discrimination claim under Title VII:  "that (i) the plaintiff suffered an adverse

employment action (ii) because of the plaintiff's race . . . ."  *Baloch v. Kempthorne*, 550 F.3d

1191, 1196 (D.C. Cir. 2008).

　　Traditionally, courts have examined Title VII discrimination claims under the three-step

burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

However, once an employer has proffered a legitimate, non-discriminatory reason for the adverse

employment action, the *McDonnell Douglas* burden-shifting framework no longer applies, and

the court must simply determine whether the plaintiff has produced "sufficient evidence for a

reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual

reason and that the employer intentionally discriminated against the employee on the basis of

race . . . ."  *Brady v. Office of the Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008).

Plaintiff argues that defendant discriminated against her on the basis of her race by not selecting her to fill the DAGC position in the Finance Division.  Defendant contends that there were legitimate, non-discriminatory reasons for terminating the Vacancy Announcement and selecting Ms. Malone as the DAGC, and that plaintiff has failed to produce sufficient evidence to raise an inference that it's reason for hiring Ms. Malone was pretextual.  As explained herein, the Court agrees, and will grant summary judgment.

## II.   LEGITIMATE NON-DISCRIMINATORY REASON

The adverse employment action suffered by the plaintiff in this case was the cancellation of the DAGC Vacancy Announcement.  *See Chappell-Johnson v. Powell*, 440 F.3d 484, 488 (D.C. Cir. 2006) (finding that plaintiff suffered an adverse employment action when she was "denied" the "opportunity to compete for a vacant position").  However, the mere fact of cancelling a Vacancy Announcement does not give rise to an inference of discrimination; it is "[t]he motivation behind the vacancy cancellation [that] determines whether the [employer's] action violates Title VII." *Terry v. Gallegos*, 926 F. Supp. 679, 710 (W.D. Tenn. 1996) (cited in *Lewis v. Dist. of Columbia*, 653 F. Supp. 2d 64, 74 (D.D.C. 2009)).  Thus, as with other adverse employment actions, if defendant can show that it in fact cancelled the vacancy announcement for a legitimate, nondiscriminatory reason, summary judgment is appropriate. *Brookens v. Solis*, 616 F. Supp. 2d 81, 93 n. 13 (D.D.C. 2009).

Defendant claims that it cancelled the Vacancy Announcement and hired Ms. Malone as DAGC because it wanted to retain Ms. Malone's skills within the agency.  It is undisputed that prior to Ms. Mulrain's interview for the DAGC position, Ms. Malone received and accepted a job offer from the Department of the Army for a senior attorney position.  (Def.'s Statement ¶¶

38-39; Pl.'s Statement ¶¶ 38-39.)  In order to try and retain Ms. Malone's services within HUD,

Ms. Cruciani contacted Ms. Malone and suggested that she explore other options within HUD

OGC.  (Def.'s Statement ¶¶ 41-42; Pl.'s Statement ¶¶ 41-42.)  Defendant contends that while

Ms. Malone was meeting with Mr. Opitz to discuss a position in the Office of Procurement, she

also asked about any other openings in divisions under his supervision and was told about the

Finance Division DAGC position.  (Def.'s Statement ¶ 47.)  Mr. Opitz has stated that he knew

that other OGC attorneys had spoken highly of Ms. Malone and so he suggested that she speak to

Ms. Davies about the DAGC position.  (*Id.* ¶ 48.)  Defendant further contends that Ms. Davies

had previously worked with Ms. Malone and thought highly of her abilities, so she agreed to

meet with Ms. Malone regarding the DAGC position.  (*Id.* ¶ 50.)

After Ms. Davies' meeting with Ms. Malone, Mr. Opitz informed Ms. Cruciani that he

and Ms. Davies would be happy to have Ms. Malone in the Finance Division as the DAGC.  (*Id.*

¶ 55; Pl.'s Opp'n at 8.)  Ms. Cruciani considered the reassignment doubly beneficial, as it would

not only fill the Finance Division DAGC position but also retain Ms. Malone's skills within the

agency.  (Def.'s Statement ¶ 56.)

Thus, defendant has offered a legitimate, non-discriminatory reason—supported by

internal agency documents and declarations—for the selection of Ms. Malone.  Accordingly, the

burden shifts back to plaintiff and the question becomes whether her evidence creates a material

dispute on the ultimate issue of discrimination.  *See McGrath v. Clinton*, 666 F.3d 1377, 1380 n.

3 (D.C. Cir. 2012).

III.    **PRETEXT**

To establish pretext, the employee must offer evidence showing that the employer's explanation is "false, that it is a lie, or that the employer's real motivation was discriminatory." *Aka v. Washington Hosp. Cent.*, 156 F.3d 1284, 1289 n. 3 (D.C. Cir. 1998).

A.    **Comparative Qualifications**

In a non-selection case, a plaintiff can satisfy her burden of persuasion by showing that "a reasonable employer would have found the plaintiff to be significantly better qualified for the job." *Calhoun v. Johnson*, 632 F.3d 1259, 1263 (D.C. Cir. 2011).  To do so, she must present evidence of "stark superiority of credentials over those of the successful candidates." *Stewart v. Ashcroft*, 352 F.3d 422, 429 (D.C. Cir. 2003).

In order to accomplish this "formidable task," *Nyunt v. Tomlinson*, 543 F. Supp. 2d 25, 39 (D.D.C. 2008), plaintiff relies on the argument that since the position required specialized knowledge of GNMA issues (*see* Plaintiff's Sur-Reply, Sept. 18, 2012 [ECF No. 40-1] at 1), and since plaintiff was the only applicant to possess such experience, by definition, she should have been hired over Ms. Malone, as well as the six other "best qualified candidates."  To buttress this argument, she relies principally on the report of her expert, Mr. Arnold Gerber, who has opined that not only was Ms. Mulrain significantly more qualified for the DAGC position than Ms. Malone, but that because the position required specialized knowledge of GNMA issues, Ms. Malone did not even meet the minimum job requirements.  (Pl.'s Opp'n at 33.)

Mr. Gerber examined the Position Description and the Vacancy Announcement for the DAGC position and concluded that the supervisory duties described therein were insufficient to justify its classification at the GS-15 level; thus, the only basis on which the position could be

supported at GS-15 is if the selectee were a GNMA subject matter expert.  (Pl.'s Ex. 32, Gerber

Report at 2-3.)  Specifically, he relies on the fact that the Vacancy Announcement did not require

formal supervisory experience, but did require "specialized legal experience" at or above the GS-

14 level in the area of "federal law and practices related to the secondary mortgage market,

banking, structured finance," and "mortgage backed securities."  (Pl.'s Opp'n at 4; Def.'s Ex. 8

at 2.)  Plaintiff then asserts that the only place in HUD where an applicant could acquire this

requisite "specialized legal experience" is within the Finance Division, because "GNMA is the

only entity in HUD that operates [mortgage backed securities] and multiclass securities programs

and engages in all of these activities."  (Pl.'s Opp'n at 4.)

     Because Ms. Malone had never worked in the Finance Division, Mr. Gerber concluded

that she was not qualified for the DAGC position.  (*Id.* at 6.)  In fact, plaintiff argues that *none* of

the others on the "best qualified" list were in fact qualified for the job because none of them had

worked in the Finance Division.  (*Id.* at 19.)  Ms. Mulrain, on the other hand, having worked in

the Finance Division on GNMA matters for eight years, satisfied the requirements for the

position as Mr. Gerber has defined them.  (*Id.* at 19.)  Thus, by redefining the requirements of the

DAGC job, plaintiff has effectively created a pool of only one qualified applicant—plaintiff

herself.

     Plaintiff's premise about the prerequisites for the job cannot withstand scrutiny.  As is

clear from the record, the position was designed to be supervisory in nature and, while some

experience in HUD-related financial matters was required, that experience did not need to be

specific to GNMA or the Finance Division.  (*See* Defendant's Reply, Aug. 17, 2012, [ECF No.

34] ("Def.'s Reply") at 2.)  Prior to her reassignment to the Finance Division, Ms. Malone had

been a DAGC in the Administrative Proceedings Division for nearly 10 years, and she therefore had far more supervisory experience than Ms. Mulrain.  (*Id.* at 2.)  She had also worked extensively on matters involving FHA-insured mortgages and proceedings before the Mortgagee Review Board, and had previously worked with GNMA and Finance Division staff.  (Def.'s Statement ¶ 35.)  Thus, according to defendant, Ms. Malone more than satisfied the job requirements.

Despite this argument, plaintiff attempts to use her expert's opinion to create "a genuine issue of material fact about whether Ms. Malone met a fundamental and objective requirement for the job, which demands that summary judgment be denied."  (Pl.'s Opp'n at 7.)  This does not work.

The opinions of plaintiff's expert Mr. Gerber, even if correct, do not create any triable issues of fact in this case.  *See, e.g.*, *Beyah v. Dodaro*, 666 F. Supp. 2d 24, 35 (D.D.C. 2009) (citing cases) ("Because [the expert's] opinion about the quality of plaintiff's written work merely second-guesses the subjective judgments of plaintiff's supervisors, it cannot be relied upon to create any triable issues of fact.").  The relevant question in a Title VII case is not the correctness of the employer's proffered reason for its action, but rather "whether the employer honestly believes in the reasons it offers."  *Fischbach v. Dist. of Columbia Dep't of Corrections*, 86 F.3d 1180, 1183 (D.C. Cir. 1996).  As explained below, the evidence is clear that plaintiff's supervisors viewed the position as one that was managerial in nature that did not require GNMA subject matter expertise.  Thus, even if Mr. Gerber were correct that, given the employers' understanding of the job requirements, the DAGC position should not have been approved at the GS-15 level, that would simply show that the position had been mis-classified.  It would not,

10

however, show that plaintiff's supervisors did not honestly believe Ms. Malone was eminently

qualified for the DAGC position when they reassigned her into that position. Thus, Mr. Gerber's

opinion "ha[s] no probative value and the Court can give it no weight." *Nance v. Librarian of*

*Congress*, 661 F. Supp. 794, 796 (D.D.C. 1987) (declining to consider expert testimony rating

the comparative qualifications of the plaintiff and the selectees in part because "rating

procedures were not used in the selection process under review at any stage").[1]

The evidence clearly demonstrates that both Mr. Opitz and Ms. Davies viewed the

DAGC position as one that was managerial in nature and that did not require specific GNMA

subject matter expertise. For example, e-mails from Mr. Opitz show that, because Ms. Davies

was retirement-eligible, he was concerned about succession planning and believed it would be

"prudent as a matter of succession planning to develop management skills with another attorney

in the Division." (Def.'s Ex. 4.) In Ms. Davies' declaration, she too stated that she saw the

DAGC's role as largely to assist in supervisory activities. (Davies Decl. ¶ 10.)[2] Consistent with

that view, the initial Position Description for the position classified it as a "Supervisory

---

[1] Although Judge Lamberth relied on Mr. Gerber's opinion in *Perry v. Donovan*, 733 F. Supp. 2d 114, 117 n.5 (D.D.C. 2010), that case involved an employee's challenge to a finding as to her qualifications for a position. *See id.* at 116-17. This case more closely resembles *Lee v. Astrue*, 2010 WL 1068129, at *5 (D. Md. Mar. 18, 2010), in which the district court found Mr. Gerber's testimony unhelpful because, while Mr. Gerber opined "that the performance standards [used by the employer in that case] were vague and subjectively applied," that fact "does not indicate that they were applied *pretextually* in [the plaintiff's] case." *Id.* at *5 (emphasis added).

[2] Plaintiff points to Ms. Davies' deposition testimony, in which she admitted that she did not want a deputy because she had no intention of retiring and did not want to be pressured into retiring, as support for her view that the job was not intended to be supervisory in nature. (Pl.'s Opp'n at 35.) But the mere fact that Ms. Davies did not want a deputy has no bearing on the job requirements for the deputy position that was eventually created. If anything, it confirms that Ms. Davies understood that a "deputy" would, by definition, share in her supervisory responsibilities.

Attorney-Advisor, GS-0905-15" and contained a lengthy description of the supervisory and managerial authority to be exercised by the selectee.  (Def.'s Ex. 7.)  And finally, the Vacancy Announcement itself required that qualified candidates demonstrate that they had successfully "supervised a staff of professionals."  (Def.'s Ex. 8.)  There is simply *no* question that plaintiff's employers considered the DAGC position to be a supervisory one.

Additionally, there is *no* evidence that plaintiff's supervisors believed that the DAGC position had to be filled by someone within the Finance Division.  Well before the Vacancy Announcement was even posted, Mr. Opitz stated that he knew of "several talented attorneys both inside *and outside* the division who would be good candidates" for the position.  (Def.'s Ex. 4 (emphasis added).)  And indeed, of the seven applicants whom the Office of Human Resources deemed to be the "best qualified" for the position, only Ms. Mulrain had previous experience in the Finance Division, which plaintiff's expert now says is the only HUD office in which an applicant could have acquired the necessary experience to be so "qualified," whereas the six other applicants came from a variety of other OGC offices.  (*See* Def.'s Statement ¶ 29; Def.'s Mot. at 9.)

That breadth of experience among the "best qualified candidates" is unsurprising. Nothing in the Vacancy Announcement required that the applicants come from within the Finance Division or have previous experience working with GNMA-related matters.  To the contrary, although it was clear from the Vacancy Announcement that the selected candidate would be required to work on GNMA program matters, the specialized legal experience required was defined broadly to include "demonstrated knowledge of federal law and practices related to the secondary mortgage market, banking, structured finance, mortgage-backed securities,

bankruptcy and tax." (Def.'s Ex. 8.) Similarly, the first Quality Ranking Factor was
"[k]nowledge of federal law and practices related to the program and mission of HUD." (*Id.*)
The Vacancy Announcement specified that such knowledge "*could* include any of" several
experiences, of which GNMA experience was only one. (*Id.*)

Thus, there is simply no evidence from which a jury could reasonably find that—given
their understanding of the job requirements—her employers did not "honestly believe" Ms.
Malone was qualified for the DAGC position when they reassigned her into that position.
*Anderson*, 477 U.S. at 252. That they may have been inaccurate (which they were not) in
believing her to be qualified is irrelevant. *See Tolson v. James*, 315 F. Supp. 2d 110, 116 n. 5
(D.D.C. 2004) (noting that the accuracy of the determination that the applicant was minimally
qualified for the position "has no bearing" on the employer's honest belief that the applicant had
the most relevant experience for the position).[3]

Because both Ms. Mulrain and Ms. Malone met the objective requirements for the DAGC
position as their employers understood them, the Court must defer to the government's decision
to select Ms. Malone—and thereby retain her services within the agency—over Ms. Mulrain.
The selection of a well-respected employee with significant supervisory experience but no

---

[3] Plaintiff also relies on declarations from two former OGC employees, James Fagerberg and
Sam Hutchinson, who offered their opinions that GNMA issues are so highly specialized that
only an attorney with experience in the Finance Division would be qualified to address them;
even attorneys with seemingly related experience in other HUD Divisions—like Ms. Malone—
would not be qualified. (*See, e.g.*, Pl.'s Opp'n at 12-13 & n.5.) However, neither Mr. Fagerberg
nor Mr. Hutchinson was actually employed at HUD at the time the DAGC position was being
filled (and Mr. Hutchinson was *never* employed in the Finance Division), and thus neither was
involved in the creation of the DAGC position or in filling it. Thus, their opinions of the
necessary qualifications for the job have no bearing on what Ms. Mulrain's supervisors
legitimately believed the job requirements to be. It is well established that "[i]t is the perception
of the decisionmaker which is relevant." *Waterhouse*, 124 F. Supp. 2d at 7. Their opinions
therefore are not sufficient to defeat summary judgment.

13

GNMA-specific expertise over one with significant GNMA expertise but far less supervisory

experience is precisely the type of business decision that courts are not to second-guess.  *See*

*Jackson v. Gonzales*, 496 F.3d 703, 708 (D.C. Cir. 2007).  Courts must not act as "super-

personnel department[s] that reexamine[] an entity's business decision[s]."  *Stewart v. Ashcroft*,

352 F.3d 422, 429 (D.C. Cir. 2003) (internal quotation marks omitted).  Instead, faced with such

a decision, courts must "'defer to the [employer's] decision of what nondiscriminatory qualities

it will seek' in filling s position."  *Jackson*, 496 F.3d at 708 (quoting *Stewart*, 352 F.3d at 429).

### B.    Lack of Documentation of Ms. Malone's Qualifications

As further support for her assertion that defendant's proffered reason for hiring Ms.

Malone is pretextual, plaintiff argues—again relying on her expert—that defendant "could not

just laterally reassign Ms. Malone into the Deputy Assistant GC position without a specific,

recorded determination that she met all of the objective experiential requirements specified by

HUD."  (Pl.'s Opp'n at 34.)  According to plaintiff, since her expert did not find evidence that

HUD in fact made such a formal determination, defendant's motion should be denied.  (*Id.*)

As an initial matter, it is unclear what authority, if any, plaintiff relies on to support her

expert's view that such a determination is required.  Additionally, the signature on the internal

document prepared for Ms. Malone's reassignment into the DAGC position verified that "the

proposed action was in compliance with statutory and regulatory requirements."  (Def.'s Ex. 24.)

Neither plaintiff nor her expert has provided an explanation as to why that statement is

insufficient to meet the supposed documentation requirement.  But regardless, violation of hiring

protocol is not, by itself, sufficient to justify an inference of discriminatory intent; instead, it

"'may' be probative of the employer's 'true motivation' if (1) the violation is suspicious, in and

of itself, (2) the agency 'inexplicably departed' from its normal procedures, or (3) the violation inherently raises credibility questions." *Perry v. Shinseki*, 783 F. Supp. 2d 125, 138-39 (D.D.C. 2011) (internal citations omitted).  But here, there is no evidence that defendant's actions in this case were inconsistent with its normal procedures, nor do plaintiff's conclusory allegations of discriminatory intent suffice to render defendant's actions suspicious or lacking in credibility.

To the contrary, it is clear from the undisputed evidence that Mr. Opitz, Ms. Davies, and Ms. Cruciani were all familiar with Ms. Malone's excellent reputation within the agency (*see* Def.'s Statement ¶¶ 41, 48, 50, 53), and they believed that she in fact possessed the qualifications that they thought were necessary for the job.

### C.      Inconsistencies in Defendant's Positions

Plaintiff also argues that minor inconsistencies in defendant's positions over time demonstrate that defendant's stated reason for hiring Ms. Malone is pretextual.  (Pl.'s Opp'n at 37-40.)  Having reviewed these alleged inconsistencies, the Court finds that none of them gives rise to a genuine dispute of material fact so as to defeat summary judgment.

First, many of the alleged inconsistencies are nothing of the sort.  For example, plaintiff points to the fact that HUD told the EEOC that its only reason for selecting Ms. Malone for the position was to retain her services within the agency, not because she was objectively more qualified than Ms. Mulrain, as it now claims in this litigation.  (*See id.* at 5-6, 39.)  However, these positions are not inconsistent; HUD still cites its desire to keep Ms. Malone as an employee as its primary reason for reassigning her; the mere fact that—when challenged by plaintiff's expert—they have also explained how her experience satisfies the necessary job qualifications in no way supports any argument of pretext.  Similarly, plaintiff points to the fact that although Ms.

Cruciani said she was motivated to reassign Ms. Malone into the DAGC position because Mr.

Opitz and Ms. Davies were "excited to get her," Mr. Opitz said he "did not make a

recommendation" to Ms. Cruciani and Ms. Davies said she "was not involved in the final

decision" to reassign Ms. Malone.  (*Id.* at 38-39.)  But those are not inconsistent facts.  Plaintiff

admits that Mr. Opitz told Ms. Cruciani that he and Ms. Davies would "be happy" with having

Ms. Malone reassigned into the Finance Division; the difference between "excited" and

"pleased" is hardly a sufficient basis for inferring pretext.

Second, many of the alleged inconsistencies are mere gaps in recollection.  For example,

plaintiff lists several details of the hiring process that Mr. Opitz failed to recall at his depositions,

including what was said in the candidates' interviews, whether he discussed the candidates with

Ms. Davies, who directed Ms. Malone to speak with him about the Finance Division opening and

what was said in his meeting with Ms. Malone.  (*Id.* at 40-41.)  But "plaintiff must do more than

merely express an intent to challenge the credibility of the defendant's witnesses on cross

examination.  Plaintiff must produce specific facts that raise an inference of discriminatory

motive."  *Howell v. Sullivan*, 1992 WL 675147, at *5 (D.D.C. 1992) (internal quotation marks

and citations omitted).  Minor gaps in Mr. Opitz's recollection of events that occurred over a

year earlier do not suggest any discriminatory animus on his part.

"[F]actual disputes that are 'irrelevant or unnecessary' do not affect the summary

judgment determination."  *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006) (quoting

*Anderson*, 477 U.S. at 248).  None of the disputed facts cited by plaintiff are material to the

outcome of the litigation because they do not give rise to an inference of discrimination.  Instead,

"[a]ll of plaintiff's allegations are 'merely colorable' and 'not significantly probative,' making

16

them inadequate to defeat summary judgment." *Von Muhlenbrock v. Billington*, 579 F. Supp. 2d

39, 44 (D.D.C. 2008) (quoting *Anderson*, 477 U.S. at 249-50).  Even if viewed in the light most

favorable to plaintiff, these discrepancies would not allow a reasonable jury to conclude that "the

employer's asserted non-discriminatory reason was not the actual reason and that the employer

intentionally discriminated against the employee on the basis of race . . . ." *Brady*, 520 F.3d at

494.

        **D.**       **Other Evidence of Pretext**

        Plaintiff makes several other arguments to support her view that defendant was motivated

by discriminatory intent.  First, plaintiff asserts that defendant steered Ms. Malone into the

Finance Division DAGC position so as not to have to offer the position to Ms. Mulrain.  (*See*

Pl.'s Opp'n at 4-5, 19-20, 42.)  It is undisputed that Ms. Malone was encouraged to consider

several positions, of which the Finance Division was only one.  (Def.'s Statement ¶¶ 44-47.)  But

even if Ms. Malone had been encouraged to apply for only the DAGC position, that would not

raise an inference of discrimination.  *See, e.g.*, *Perry*, 783 F. Supp. 2d at 143 (finding that

evidence that employer steered the position toward the eventual selectee was "not actionable"

absent some evidence that the decision was based on a discriminatory motive); *Downing v.

Tapella*, 729 F. Supp. 2d 88, 97 (D.D.C. 2010) (finding that pre-selection "does not bear on

[plaintiff's] discrimination claim" because plaintiff did not "allege or offer any evidence that a

discriminatory animus factored in the pre-selection").  Because plaintiff has not offered any

credible evidence that defendant was motivated by discriminatory intent in hiring Ms. Malone,

the mere fact that she may have been steered into the DAGC position does not create a genuine

issue of fact as to whether defendant's stated reason for hiring her was pretextual.  *See Tolson*, 315 F. Supp. 2d at 118-19.

Plaintiff also alleges that Ms. Cruciani created a GS-15 position specifically for a Caucasian applicant for the DAGC position and went over her African-American supervisor's head to reassign that person into the position.  (Pl.'s Opp'n at 42.)  Plaintiff asserts that evidence of better treatment of even one similarly situated employee is evidence of discrimination.  (*Id.* at 42 n. 19.)  However, the Court is not persuaded that this action in fact constituted "better treatment of a similarly situated employee."  There is no evidence that Ms. Mulrain—like the Caucasian employee in question—contacted Ms. Cruciani about other reassignment possibilities, nor that she was either interested in or qualified for the position that was eventually filled by that employee.

Importantly, in addition to plaintiff, several other applicants, including two Caucasians, were passed over in favor of Ms. Malone.  The record also reflects defendant's long history of favorable treatment of Ms. Mulrain.  For example, it was Ms. Davies herself who initially agreed to reassign Ms. Mulrain into the Finance Division from another HUD component (despite her lack of GNMA experience, which plaintiff now contends is required in order to work in the Division).  (*See* Def.'s Mot. at 8.)  Ms. Mulrain had received outstanding performance ratings from both Ms. Davies and Mr. Opitz, and Ms. Mulrain even admitted that Ms. Davies had said she was "happy" that Ms. Mulrain had applied for the DAGC position.  (*See id.* at 8-9.)

These are not the actions of an employer who harbors a discriminatory animus.  As this Circuit has often noted, "when the person who made the decision to fire was the same person who made the decision to hire, it is difficult to impute to [that person] an invidious motivation

18

that would be inconsistent with the decision to hire." *Vatel v. Alliance of Auto. Mfrs.*, 627 F.3d 1245, 1247 (D.C. Cir. 2011) (internal quotation marks omitted) (citing *Waterhouse*, 298 F.3d at 996. The same is true in a non-selection case; for instance, in *Higgins v. Inspector General, U.S. Dep't of Housing and Urban Development*, 851 F. Supp. 2d 178 (D.D.C. 2012), this Court declined to impute discriminatory intent to an employer's non-selection of the plaintiff where the employer had promoted the plaintiff to his current position and provided him with increasing job responsibilities and opportunities over his years of employment. *Id.* at 189.

Thus, given this evidence that Ms. Mulrain's supervisors had treated her more than favorably throughout her years in the Finance Division, as well as the lack of any basis for a jury to infer discriminatory intent on the part of defendant, the Court finds that plaintiff has not rebutted defendant's legitimate, nondiscriminatory reason for laterally moving Ms. Malone into the DAGC position.

## IV.   MIXED MOTIVE

Plaintiff also raises a mixed motive theory of relief under which a plaintiff "does not contest the *bona fides* of the employer's justifications but rather argues race was also a factor motivating the adverse action." *Ginger v. Dist. of Columbia*, 527 F.3d 1340, 1345 (D.C. Cir. 2008). As already explained in Section III above, plaintiff has failed to offer any probative evidence raising a genuine issue of fact as to whether defendant impermissibly considered Ms. Mulrain's race in declining to select her for the DAGC position, and therefore she cannot succeed on a mixed motive approach.

## CONCLUSION

For the foregoing reasons, the Court grants defendant's motion for summary judgment.

A separate order accompanies this Memorandum Opinion.


_____/s/_____
ELLEN SEGAL HUVELLE
United States District Judge

DATE:  October 29, 2012